# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Manuel Melendez, | Case No. 2:15-cv-02076-JAD-VCF |
| Petitioner, | |
| v. | **Order Denying Motions for Reconsideration, Discovery, and Leave to File Third Amended Petition** |
| Dwight Neven, et al., | |
| Respondents. | [ECF Nos. 79, 80, 81] |

Counseled petitioner and Nevada state prisoner Manuel Melendez brings a second amended petition for writ of habeas corpus under 28 U.S.C. § 2254[1] to challenge his conviction for lewdness with a minor under the age of fourteen.[2]  Last year, I granted in part and denied in part respondents' dismissal motion, denied Melendez's request to file a supplemental opposition for lack of good cause, and instructed the parties to complete the merits briefing on Melendez's remaining claims.[3]  Melendez moves to reconsider the denial of leave to file a supplemental opposition and requests leave to file a third amended petition and conduct discovery.  Because I find that Melendez has not established a "gateway" innocence claim, I deny his motions.

## Background[4]

In 2010, a jury convicted Melendez of lewdness with a minor under the age of 14.[5]  An amended judgment of conviction was entered in April 2012, revising his sentence to life with minimum parole eligibility after 10 years on five counts with all counts running concurrently.[6]

## A.     Federal habeas proceedings

On October 29, 2015, private counsel, Cal J. Potter, III, filed Melendez's original federal

---

[1] ECF No. 51.

[2] ECF No. 19-6, 19-11.

[3] ECF No. 70.  Respondents answered the second amended petition, ECF No. 76, and Melendez replied, ECF No. 77.

[4] As the parties are familiar with the factual and procedural background of this case, this order only discusses what is relevant to the current motions.

[5] ECF No. 19-3.

[6] ECF No. 19-11.

habeas petition.[7]  Respondents were served with the petition and ordered to respond.[8]  They moved to dismiss the petition in April 2017, arguing that claims were unexhausted and non-cognizable.[9]  Potter moved to withdraw from the case before filing a response.[10]  I granted Potter's request to withdraw and ultimately granted Melendez's request to appoint new counsel.[11]

In February 2018, the Federal Public Defender was appointed through attorney T. Kenneth Lee.[12]  Lee sought leave to follow a two-step process of filing a protective amended petition, preserving all then-known claims and potentially avoiding relation-back issues, and later filing a second amended petition after Lee had a full opportunity to investigate all of Melendez's claims.[13]  I found that the bifurcated amendment procedure was appropriate and denied the dismissal motion as moot in light of the anticipated amendment.[14]  In November 2018, Melendez filed a second amended petition, alleging four grounds for relief.[15]

Respondents again moved to dismiss,[16] arguing that all four grounds in the second amended petition were time-barred.  The motion was ripe for decision in July 2019.  More than seven months later, in February 2020, the Federal Public Defender filed a notice that Jonathan Kirshbaum was replacing Lee as Melendez's lead counsel.[17]

**B.  Melendez's motion to supplement his opposition**

On March 12, 2020, Kirshbaum moved for leave to file a supplemental opposition to respondents' dismissal motion.[18]  He represented that only days earlier, he learned that "claims

---

[7] ECF No. 1.

[8] ECF No. 5.

[9] ECF No. 16.

[10] ECF Nos. 29–30.

[11] ECF Nos. 34, 39.

[12] ECF No. 41.

[13] ECF Nos. 42–43.

[14] ECF No. 44; *see also* ECF No. 45 (first amended petition).

[15] ECF No. 51.

[16] ECF No. 57.

[17] ECF No. 68.

[18] ECF No. 69.

of innocence played a central role in this case."[19]  Counsel asserted that a supplemental

opposition would establish a gateway claim of innocence under the United States Supreme

Court's decision in *Schlup v. Delo*,[20] allowing Melendez to overcome any untimeliness.

In the motion, counsel pointed to post-trial evidence suggesting that Melendez was not

physically present in the home during the time period when Margarita Melendez (Melendez's ex-

wife and the grandmother of the victim, A.C.) testified the abuse occurred.[21]  Based on eviction

documentation and information Margarita provided in an application for temporary protective

order (TPO), counsel asserted it was impossible for Melendez to have committed the crimes.

Next, he argued that new evidence undermined Margarita's credibility, pointing to testimony in

the state habeas proceedings by A.C. and Ana Herrejon, Margarita's daughter and A.C.'s

mother.[22]  The motion argued that Margarita provided the sole eye-witness testimony of abuse

but she was not a credible witness.  Thus, in the interests of justice, Melendez should not be

deprived of the opportunity to present a *Schlup* gateway claim.  No proposed supplement was

attached to the motion; instead, Kirshbaum asked for an additional 60 days to file a supplemental

opposition in order to review the record and investigate the case.

I addressed the motion before evaluating dismissal:

> This case has been pending for more than four years and respondents' dismissal
> motion has been fully briefed for many months, yet now that Kirshbaum is lead
> counsel, he asks for a "do over" to change strategy.  At this late stage, the request
> does not demonstrate good cause.  The arguments and evidence upon which
> Kirshbaum relies is not new, rather, it was all available to his predecessor.  Lee
> filed a 14-page opposition relying on a different theory—equitable tolling.  Where
> the only new development is an internal staffing change, the interests of justice do
> not support additional briefing.  The motion is therefore denied.[23]

Analyzing the opposition Lee filed, I found that Melendez was not entitled to equitable tolling

---

[19] *Id.* at 2.

[20] *Schlup v. Delo*, 513 U.S. 298 (1995).  "[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" after the statute of limitations has expired.  *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) (citing *House v. Bell*, 547 U.S. 518 (2006); *Schlup v. Delo*, 513 U.S. 298 (1995)).

[21] ECF No. 69 at 3:1–12.

[22] *Id.* at 4–5.

[23] ECF No. 70 at 4.

based on a theory of attorney abandonment.[24]   However, two of Melendez's claims relate back to the original petition.  I thus dismissed Grounds 1, 2, and 4(B) as time-barred and ordered the parties to complete the briefing on Melendez's timely grounds for relief: Grounds 3 and 4(A).[25] Melendez now moves for reconsideration of that order, for an opportunity to file a third amended petition, and to allow discovery.[26]

## Discussion

### A.    Melendez's reconsideration motion [ECF No. 79]

A motion to reconsider must set forth "some valid reason why the court should reconsider its prior decision" by presenting "facts or law of a strongly convincing nature."[27]   Reconsideration is appropriate if the court "(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."[28]  "A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled."[29]

Melendez moves to reconsider the denial of leave to file a supplemental opposition to the dismissal motion.[30]   He argues that he is innocent and a miscarriage of justice will result if he is prevented from asserting and proving his innocence because of flaws in his prior pleadings.  He contends that reconsideration is warranted because "the initial decision was manifestly unjust"[31] and he should be allowed to pursue appropriate claims and arguments related to his innocence at this prejudgment stage of the case.  Melendez acknowledges that reconsideration is disfavored but insists that it is appropriate here because he is innocent.[32]

---

[24] *Id.* at 5–8.

[25] ECF No. 70 at 12–13.

[26] Roughly one month after the ruling on the dismissal motion, the Federal Public Defender filed a notice of appearance stating that Jeremy Baron was replacing Jonathan Kirshbaum as Melendez's third lead counsel.  ECF No. 71.  Baron filed all three current motions.

[27] *Frasure v. United States*, 256 F. Supp. 2d 1180, 1183 (D. Nev. 2003).

[28] *Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

[29] *Brown v. Kinross Gold, U.S.A.*, 378 F. Supp. 2d 1280, 1288 (D. Nev. 2005).

[30] ECF No. 79.

[31] *Id.* at 8 (citing LR 59-1(a)).

[32] ECF No. 86 at 2 (citing LR 59-1).

Respondents oppose the reconsideration motion, asserting that Melendez does not meet the legal standard because he is simply repeating the same argument he previously presented in more detail.[33]  The current motion, they contend, fails to identify any newly presented evidence, and the prior order was not manifestly unjust because Melendez was not denied the opportunity to obtain federal review of his claims.  Rather, respondents maintain that the court correctly denied an untimely request to assert an alternative argument after the matter was fully briefed and pending adjudication.  To determine whether the prior ruling was manifestly unjust, I must consider the merits of Melendez's actual-innocence claim set forth in the proposed supplemental opposition.

## B.     Melendez's actual-innocence claim

### 1.     *Relevant legal authority*

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar [or] expiration of the statute of limitations."[34]  In this regard, "actual innocence" means actual factual innocence, not mere legal insufficiency.[35] "[W]here post-conviction evidence casts doubt on the conviction by undercutting the reliability of the proof of guilt, but not by affirmatively proving innocence, that can be enough to pass through the *Schlup* gateway to allow consideration of otherwise barred claims."[36]  However, the Supreme Court has emphasized that "tenable actual-innocence gateway pleas are rare: '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"[37]

"To be credible, [an actual-innocence] claim requires petitioner to support his allegations of constitutional error with *new reliable evidence*—whether it be exculpatory scientific evidence,

---

[33] ECF No. 84.

[34] *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

[35] *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).

[36] *Lee v. Lampert*, 653 F.3d 929, 938 (9th Cir. 2011) (en banc) (internal quotation omitted).

[37] *McQuiggin*, 569 U.S. at 386 (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."[38]
To be "new" for purposes of an actual-innocence claim, the evidence need only be "newly
presented," *i.e.*, reliable evidence "that was not presented at trial," as opposed to "newly
discovered" and thus previously unavailable.[39]   Actual-innocence review incorporates "*all
evidence*," including (i) evidence alleged to have been improperly admitted (but with due regard
to its questionable reliability), (ii) evidence tenably claimed to have been wrongfully excluded by
the trial court, (iii) evidence the defense did not present to the jury at trial, or (iv) evidence that
became available only after the trial.[40]   Newly presented evidence may call into question the
credibility of trial witnesses, potentially requiring credibility assessments on federal habeas
review.[41]   However, a *Schlup* claim attempting to discredit prosecution witnesses provides less
support for actual innocence than affirmatively presenting new exculpatory evidence.[42]

### 2. *Relevant trial evidence*

In February 2008, Melendez was charged by information with six counts of lewdness
with a minor under the age of 14.[43]   None of the six counts were alleged to have occurred on a
specified date or within a range of dates; instead, the offenses allegedly occurred over a span of
approximately ten months: "on or between April 2006 and January 20, 2007."[44]

### a. *Margarita's testimony*

At trial in June 2010, Margarita testified that Melendez molested A.C. in their rental
home on Cabana Drive in 2006.[45]   A.C. was three years old at the time, and she referred to

---

[38] *Schlup*, 513 U.S. at 324 (emphasis added).

[39] *Griffin v. Johnson*, 350 F.3d 956, 961–63 (9th Cir. 2003).

[40] *Id.* (citing *Schlup*, 513 U.S. at 327–28).

[41] *Schlup*, 513 U.S. at 330; *Stewart v. Cate*, 757 F.3d 929, 941 (9th Cir. 2014).

[42] *E.g.*, *Lee*, 653 F.3d at 943–45 (holding that a reasonable juror may have rejected an expert's speculation and, even assuming a police report constituted new evidence, jurors may still have convicted Lee given all they heard at trial); *Sistrunk v. Armenakis*, 292 F.3d 669, 675–76 (9th Cir. 2002) (en banc) (finding that excluded evidence had "some impeachment value" but was "far from conclusive" and thus did not undermine confidence in the conviction).

[43] ECF No. 17-1.

[44] *Id.*

[45] ECF Nos. 18-1 at 30–35.

Melendez by the nickname "Tata," meaning "a protective figure like a grandpa."[46]  Margarita

testified that, on two occasions, she made early morning shopping trips and returned home to

find A.C. lying in bed naked with Melendez while he wore only underwear and hugged or held

his body against A.C.'s.[47]  According to Margarita, Melendez told her there was "something

going on" with A.C. and A.C. was getting up early and going into their bedroom when Margarita

left on early morning shopping trips.[48]  On a third occasion, Margarita testified that she returned

from the store to find A.C. naked with wet hair appearing as though she had recently showered.[49]

Margarita testified that when Melendez was asked to explain the situation, he claimed that A.C.

had wet herself in bed so he gave her a shower.[50]  This incident alarmed Margarita because she

was the only person who bathed A.C., and A.C. never had bed-wetting accidents.[51]

On a fourth occasion, Margarita testified that she found Melendez and A.C. naked in the

living room with A.C. kneeling on a pillow and Melendez behind her touching her buttocks,

which he was spreading apart.[52]  When he realized Margarita had entered the living room,

Melendez jumped over the couch and presented to be asleep.[53]  Margarita testified she then hit

Melendez in the face multiple times, causing him to ask what was going on and he then

immediately put his clothes on and left the house screaming that she was crazy.[54]  Margarita

asked A.C. what had happened, and she testified that A.C. told her, "my Tata got my clothes off,

my panties."[55]  A.C. also told Margarita, "Tata takes my underwear off and he touches my pee-

pee [vagina] and my caca [anus]," and he rubbed her vagina  and "that hurts a lot."[56]

---

[46] *Id.* at 25, 29.

[47] *Id.* at 31–32.

[48] *Id.* at 32.

[49] *Id.* at 33.

[50] *Id.* at 32.

[51] *Id.* at 33, 35.

[52] *Id.* at 30.

[53] *Id.*

[54] *Id.*

[55] *Id.* at 33.

[56] *Id.*

On cross-examination, defense counsel asked Margarita to recall the approximate dates or months when these incidents occurred but she could not remember any dates.[57]   However, Margarita agreed that the first two incidents were narrowed down to October and November 2006 and the living room incident was sometime in November or December 2006.[58]   Defense counsel also questioned Margarita regarding sleep medication she was taking at the time the living room incident occurred and its effect.[59]   Margarita further admitted that she traveled to visit family in Los Angeles with A.C. and A.C.'s brother in December 2006.[60]   While in Los Angeles, Margarita met Melendez for dinner and left the kids with her sister so she could spend the night with Melendez at a hotel.[61]

b.   <em>Testimony of A.C.'s aunt, the police detective, and A.C.'s therapist</em>

In addition to Margarita, three other witnesses testified that A.C. described Melendez's sexual abuse to them.   First, A.C.'s aunt, Adrianna Herrejon testified that, in December 2006, she asked A.C. if Melendez had touched her and A.C. said Melendez had touched her private areas in a repetitive back and forth motion with the palm of his hand.[62]   Adrianna further testified that A.C. told Adriana that Melendez had put his "guevo" (penis) on A.C.'s "pompis" (butt) and "it exploded."[63]   Second, Sam Solorio, a sexual-assault detective with the Las Vegas Metropolitan Police Department, testified that he interviewed A.C. in January 2007 and A.C. disclosed in Spanish that Melendez had touched her "pompis" (buttocks) and spread her cheeks.[64]   Solorio said A.C. also "stood up, turned around, bent over, grabbed her cheeks, and spread them open" to demonstrate.[65]   Third, Danielle Zuber, a clinical social worker who had 11 therapy sessions with

---

[57] *Id.* at 34–36; *see also id.* at 38 (re-direct) ECF No. 59-1 (Margarita's preliminary-hearing testimony stating she was unsure of exact dates or approximate months but knew the incidents occurred in 2006).

[58] ECF No. 18-1 at 35–36.

[59] *Id.*

[60] *Id.* at 37.

[61] *Id.*

[62] *Id.* at 26.

[63] *Id.*

[64] *Id.* at 52–55.

[65] *Id.* at 55.

A.C. in 2007, testified that A.C. told her in four separate sessions that Melendez had touched her on her buttocks—twice without Margarita present.[66]  Although when Zuber asked whether A.C. felt her Tata's touch was a good touch or a bad touch, A.C. said it was a good touch.[67]

### c.    Testimony of defense expert

Melendez presented expert testimony in his defense.  Dr. Barry Cooper, a licensed psychologist, explained the nature of false allegations of child abuse and child sexual assault to the jury.[68]  He noted that children sometimes provide false information and recall events that did not actually happen to them when, for example, they are asked a leading question.[69]  Based on his review of the transcript of detective Solorio's interview with A.C., Dr. Barry critiqued the interview as one that "would typically be conducted with an adult" and said it "didn't seem to be conducted in an age appropriate manner."[70]  In his opinion, there were no attempts to build report with A.C. or elicit baseline memories unrelated to the abuse and the abuse allegation was elicited in a leading manner.[71]  Regarding Zuber's therapy sessions, Dr. Barry opined that the therapist improperly acted as both a therapist and a fact finder, compelled a disclosure from A.C. by using a book on good touch versus bad touch, and entertained only "one hypothesis that the child was in fact abused," which he described as "problematic."[72]

### d.    Melendez's testimony

Melendez took the witness stand in his own defense.  He testified that he and Margarita separated at the end of August 2006, and he recalled the date because it was on or near the couple's anniversary.[73]  According to Melendez, he and Margarita argued at the hospital and she yelled: "she was going to put the cops on me if I go home, so that I better not go home."[74]

---

[66] *Id.* at 58–62.

[67] *Id.* at 62.

[68] ECF No. 19-1 at 11–12.

[69] *Id.* at 12–13.

[70] *Id.* at 13.

[71] *Id.*

[72] *Id.* at 14.

[73] *Id.* at 21.

[74] *Id.* at 22.

Because of this, he testified that he immediately moved to his cousin's house and stayed there until January 2007, except for a work trip to Los Angeles in late November to late December 2006.[75] Melendez testified that he spent one night at a hotel with Margarita in Los Angeles in mid-December 2006, and had dinner with her at a restaurant in Las Vegas a few days after Christmas.[76] According to his testimony, in January 2007, he decided to end the marriage and asked Margarita to start the divorce paperwork.[77] Melendez testified that he also asked her to give his wedding ring back and she answered:

> I'm not going to give you the ring back, I'm not going to give you nothing back. The only thing I'm going to do right now is throw a charge on you that you are abusing my little girl. … She said she was going to throw a charge on me, that anyway she's a small woman and knows how to talk to cops, and they always believe her, and she gets away with anything.[78]

On cross-examination, Melendez agreed with the prosecutor that he moved out in August 2006 because Margarita threatened to call the police, yet he claimed he sent her money after that, spent the night with her in California, and had dinner with her in Las Vegas.[79] The state specifically questioned Melendez about Margarita's alleged threat of a false charge:

> Q.    And did you go to the police and say, I think this lady's harassing me, and I think she's going to try and put a false charge on me, and I am concerned?
>
> A.    I think I put an application, and they didn't accept it. …
>
> Q.    My question is: on January 18th, or January 20th , when she made those statements to you, did you immediately go to the police and saying, someone is trying to put charges against , I'm concerned?
>
> A.    I think I did.
>
> Q.    Do you have a police report that shows that on January 18th, or January 20th -- Listen to my question. Do you have police reports that show that on January 18th, or January 20th , of 2007 you went to the police because Margarita said those things to you, yes or no?
>
> A.    No.[80]

---

[75] *Id.* at 22–25.

[76] *Id.* at 24–25.

[77] *Id.* at 26.

[78] *Id.*; *see also id.* at 27 (repeating Margarita's purported threat: "the only thing I'm going to do, I'm going to throw a charge on you for abusing my little girl…. Because I'm a woman, a small woman, and I always get away with it").

[79] *Id.* at 27.

[80] *Id.* at 28.

At the conclusion of the four-day trial, the jury returned a guilty verdict.[81]

### 3.    *Melendez's post-trial motion*

Within days after the jury returned the verdict, Melendez was appointed new counsel and he filed a motion for acquittal or in the alternative a new trial.[82]  He argued that there was insufficient evidence to convict because, among other things, exculpatory documentary evidence showed Melendez could not have committed the crime, and Adrianna and Margarita's testimony was inherently unreliable because of the animosity between Melendez and his former family members.[83]  Regarding exculpatory evidence, Melendez pointed to (1) a TPO issued by the state family court on October 12, 2006, ordering Melendez to stay away from Margarita,[84] and (2) an eviction invoice indicating that Melendez and Margarita were locked out of the Cabana home on October 30, 2006.[85]  In her TPO application, Margarita stated that she was hospitalized from September 22 to October 1, 2006, after which Melendez went to her home and threatened her.[86] She also stated that the couple was no longer living together as of October 1.  Melendez thus argued that he and Margarita were separated by October 2006 and evicted from the Cabana home by November 2006, so he could not have molested A.C. as Margarita testified.[87]  The trial judge heard oral argument on the motion and noted that the dates elicited at trial were uncertain:

> [T]here was a big -- fairly big gap of dates I think was from most of the Spring of '06 through November or something of '06.
>
> We knew going into this trial, we listened to the testimony of the grandmother, which was the primary witness, and we understood a couple things.
>
> First of all, there had been a lot of animosity I got the impression generated mainly over this incident, but there was a lot of animosity existing at the time of trial obviously between the grandmother and the Defendant.
>
> Also, the dates were a little soft. I don't think anybody actually was able to pinpoint

---

[81] ECF No. 19-3.

[82] ECF Nos. 19-4, 19-5.

[83] *Id.*

[84] ECF No. 52-30 at 16–20.

[85] ECF No. 53-13 at 10–11; *see also* ECF No. 52-30 at 32 (Register of Actions for *Gonzalez v. Melendez*, Justice Court Case No. 06E020711, indicating that an eviction order was granted on October 25, 2006, and sent to the constable).

[86] ECF No. 52-30 at 22–30.  *See also* ECF No. 78-1.

[87] ECF No. 52-9 at 3–6.

a particular date. It was a range of time periods, and I don't think anybody thought it was ever anything other than that.[88]

Because the jury heard testimony regarding the TPO, animosity between Melendez and A.C.'s family, and uncertain dates, the motion was denied.[89]

### 4.    *The Nevada Supreme Court's relevant ruling on direct appeal*

On direct appeal, Melendez argued that the state court should have granted him a new trial based on the conflicting evidence and testimony regarding dates presented to the jury and the newly discovered evidence of the October 30, 2006, eviction, which undermined Margarita's testimony.[90]   The Nevada Supreme Court rejected these arguments.[91]   "While some of the evidence may have been conflicting," the court reasoned that " it was not so at odds with the verdict that the 'totality of evidence fail[ed] to prove the defendant guilty beyond a reasonable doubt.'"[92]   The court held that the eviction evidence did "not indicate the probability of a different result upon retrial because, even if the invoice were to establish that the grandmother and victim were evicted from the residence, the offenses could have been committed before the eviction, well within the charged time frame."[93]   Thus, the Nevada Supreme Court affirmed the denial of Melendez's motion for a new trial.

Melendez also argued that there was insufficient evidence to support his convictions.  He asserted that Margarita and Adrianna's testimony "was incredible as a matter of law because they expressed hostility towards him, they did not contact the police immediately about the sexual conduct, and the grandmother was unable to remember specific dates and had a motive to fabricate."[94]   The Nevada Supreme Court disagreed, finding that Margarita and Adrianna's testimony was sufficient to support four counts:

---

[88] *Id.* at 7–8.

[89] *Id.* at 12–13 ("[T]he dates are without any question a little soft, but sufficiently identified and recognized, the jury didn't have any trouble with it, and neither did I.").

[90] ECF No. 19-8.

[91] ECF No. 19-10.

[92] *Id.* at 5 (citing *State v. Walker*, 857 P.2d 1, 2 (Nev. 1993)).

[93] *Id.* at 6 (citing *Sanborn v. State*, 812 P.2d 1279, 1284–85 (Nev. 1991)).

[94] *Id.* at 3.

1
2
3

Melendez denied any sexual misconduct at trial and testified that the victim's grandmother, who was his wife at the time of the offenses, instigated the prosecution because he asked her for a divorce and she was jealous of him. The jury was presented with contradictory testimony, and it was not unreasonable for the jury to accept the grandmother's and aunt's testimony as true and to reject Melendez's theory of defense.[95]

4
5

However, the court agreed with Melendez as to one count, and reversed and remanded with instructions to vacate the conviction as to that particular count.[96]

6

### 5.    *Melendez's new gateway innocence claim*

7
8
9
10
11
12
13
14
15
16
17

To support his assertion that my prior ruling was manifestly unjust, Melendez submits a 28-page proposed supplemental opposition to the dismissal motion, in which he argues that he is innocent and should pass to merits review of his untimely claims.[97] He primarily claims that Margarita committed perjury when she accused him of sexual misconduct. According to Melendez, Margarita consistently testified that he abused A.C. in November or December 2006 at the couple's home on Cabana Drive. However, Melendez contends that he moved out when couple separated in August or September 2006, Margarita was evicted on October 30, 2006, and she pursued a TPO against Melendez in October and November 2006 without saying anything about child sexual abuse. According to Melendez, "[t]hat means Margarita lied about when and where the abuse took place and the only conceivable reason for lying about those critical details is she manufactured false allegations."[98]

18
19
20

Melendez adds that Margarita may have had ulterior motives for alleging abuse. He testified at trial that Margarita threatened to falsely accuse him of abusing A.C. because she was

21
22

[95] *Id.* (citing *Rembert v. State*, 766 P.2d 890, 891 (Nev. 1988); *McNair v. State*, 825 P.2d 571, 573 (Nev. 1992)).

[96] *Id.* at 4–5.

23
24
25
26
27

[97] ECF No. 79-1. LR IA 7-3 (d) and (e) mandate that citations to exhibits "filed in the court's electronic filing system must include the document number assigned by the court," *e.g.*, "ECF No. 123" and the specific page(s) being referenced. I note that the proposed supplemental opposition is filled with many exhibit citations that lack the corresponding ECF reference. This further delayed and needlessly complicated the typical review of this case. When a habeas petitioner appears *pro se*, LSR 3-3(e) requires respondents to refer to *both* the exhibit number or letter and the document and page number assigned by the electronic filing system to ensure that "the reference is meaningful to the *pro se* petitioner." Omitting references to the ECF No. is not permitted under any local rule.

28

[98] ECF No. 79-1 at 5–6.

unhappy their marriage was ending.[99]  Shortly before that, Margarita purportedly told his sister-in-law that "if she couldn't have Manuel, then no one could."[100]  Melendez further contends that Margarita may have been motivated to falsely accuse him to gain citizenship as the caretaker of a victim of abuse.[101]  For these and multiple other reasons, he maintains that Margarita's testimony was inconsistent and wholly incredible.

Melendez further claims that the testimony of A.C. and the state's other witnesses was either potentially perjurious or not especially inculpatory.  In particular, he argues that A.C.'s accounts suggest that no sexual abuse occurred and Margarita coached A.C. into making false allegations.  Lastly, he contends that his own trial testimony was much more reliable than Margarita's when viewed against all the independent evidence.  On balance, he argues, he meets the gateway innocence standard but additional factual development may be relevant.

### 6.    *Melendez fails to meet the demanding <u>Schlup</u> standard*

Having considered the arguments and evidence set forth in Melendez's proposed supplemental opposition to the dismissal motion, I find that he has not made a convincing showing of actual innocence.  Melendez primarily asserts his innocence by attempting to discredit his ex-wife Margarita, claiming he can prove by a preponderance of the evidence that she perjured herself when she testified that she witnessed him sexually abuse A.C.  As he correctly points out, this trial boiled down to credibility—but it was not just Margarita's credibility.  The trial also hinged on *Melendez's* credibility, given that he took the stand in his own defense.  The jury heard a story of a volatile marriage with alleged threats by both Margarita and Melendez, as well as their continued encounters and communication even after those threats and the criminal acts charged in this case.  It was the jury's job to resolve questions of credibility and it did so, returning a guilty verdict.  I am not persuaded that the proposed supplemental opposition demonstrates evidence of innocence so strong as to undermine confidence in the jury's verdict.

---

[99] *Id.* at 17 (citing ECF No. 19-1 at 26).

[100] *Id.* (citing ECF No. 78-13 at 4, ¶ 15).

[101] *Id.* at 18.

Melendez contends that the dates Margarita testified to regarding the living room incident—November or December 2006—make her entire story impossible, if not wholly unreliable.[102]  He asserts that she routinely described that incident as having occurred after she was discharged from the hospital on October 1, 2006, based on sleep medication she was prescribed there.  Melendez maintains he moved out of the Cabana home while she was still in the hospital, Margarita filed the TPO application on October 11, claiming the couple no longer lived together, and the eviction occurred on October 30.  Because no one—not Melendez, Margarita, nor A.C.—lived at the Cabana home in November or December 2006 and because he moved out by October 1, Melendez accuses Margarita of committing perjury.

In light of all of the evidence before me, the dates Margarita provided in her testimony regarding the living room incident do not lead me to conclude that it was impossible for the abuse to have occurred.  Margarita could not recall the dates or months of the abuse when asked but agreed that the living room incident likely occurred in November or December 2006.  Given the date of eviction, Melendez correctly points out that the crimes could not have occurred in those two months.  However, Margarita's testimony does not preclude the possibility that the abuse occurred earlier—specifically, in October 2006.  Their trial testimony established that Melendez and Margarita had significant and intimate contact after their separation despite their arguments, alleged threats, the protective order, and the eviction.  Based on such interactions and because time is not an element of the charged offenses under Nevada law,[103] the jury could have reasonably concluded that Melendez returned to the Cabana home for some part of October 2006 and committed the charged offenses.

Additionally, I cannot conclude that the impeachment evidence Melendez now proffers would have changed the results of the trial.  The Supreme Court and the Ninth Circuit have acknowledged that "latter-day evidence brought forward to impeach a prosecution witness will seldom, if ever, make a clear and convincing showing that no reasonable juror would have

---

[102] ECF No. 79-1 at 9 (citing ECF No. 18-1 at 36).

[103] *See* ECF No. 17-1 (charging six counts of lewdness with a minor under the age of 14, which are category A felonies under NRS 201.230).

believed the heart of [the witness'] account of petitioner's actions."[104]   Melendez points to

statements by two of Margarita's daughters (Ana Herron and L.H.[105]) and two of his family

members (Sabina Yolanda Melendez[106] and Felisiana Felix Samaniego) to show that Margarita

has a reputation for lying and has committed substantial bad acts both before and after the

charged crimes, which undercuts her credibility.   These statements consist mostly of hearsay,

which provides less support for actual innocence than other forms of exculpatory evidence.

Melendez presented considerable impeachment evidence at trial.   His own testimony emphasized

her admissions that, even after the living room incident and TPO application, she kept

communicating with Melendez, went to dinner with him in Los Angeles, and spent the night at a

hotel with him.   These details painted Margarita in an unflattering light but did not cause the jury

to discredit the entirety of her testimony.   Given the significant details Margarita's testimony

provided the jury and the corroborating testimony of three other prosecution witnesses based on

A.C.'s graphic disclosures, I cannot conclude that it is more likely than not that any reasonable

juror would have had reasonable doubt.

Lastly, I note that Melendez presented a revenge theory to the jury, which involved

Margarita coaching A.C. to repeat false allegations of sexual abuse.   He testified that Margarita

said she would "throw a charge on [him]" for abusing A.C. because he asked for a divorce.[107]

---

[104] *Sawyer v. Whitley*, 505 U.S. 333, 349 (1992); *Herrera v. Collins*, 506 U.S. 390, 417 (1993) (noting that, with the exception of one affidavit, petitioner's newly discovered evidence was particularly suspect because the affidavits consisted of hearsay); *Clark v. Lewis*, 1 F.3d 814, 824 (9th Cir. 1993) (holding that new evidence primarily going to the credibility of the state's confidential witness was insufficient to establish a miscarriage of justice).

[105] ECF No. 78-13 (decl. of Tammy R. Smith, investigator at the Federal Public Defender's office, dated Aug. 24, 2020, recounting conversations with L.H., Herron, and Felisiana Felix Samaniego).   Herron is A.C.'s mother and was incarcerated at the time of the charged crimes. Herron testified at the evidentiary hearing in support of Melendez's state habeas petition, ECF No. 21-1 at 23–52, and her proffered statement aligns with her sworn testimony.   I note however that, after her release from prison, Herron's relationship with Margarita was strained.   *Id.*   Herron regained custody of A.C. and her brother and she testified that Margarita called CPS on her multiple times, prompting investigations by child protective services and the police.   *Id.* at 32–35.   Herron no longer has any contact with Margarita.   ECF No. 78-13 at 6–7.

[106] ECF No. 78-12 (decl. of Melendez, dated Aug. 18, 2020).

[107] ECF No. 19-1 at 26.

He also called on Dr. Barry to challenge the reliability of A.C.'s disclosures as false.  The jury heard Dr. Barry's critiques of A.C.'s interview with the police detective and sessions with the therapist in which A.C. disclosed that Melendez committed criminal acts.[108]  Melendez now points to A.C.'s testimony in the 2013 post-conviction evidentiary and a 2020 hearsay statement through an investigator to support his actual-innocence claim.[109]  However, A.C.'s 2013 testimony was equivocal and her 2020 out-of-court, unsworn statement carries little weight.

At bottom, I have thoroughly reviewed the record and new evidence, yet I am not persuaded that no reasonable juror would have voted to find Melendez guilty.  By determining that Melendez fails to meet the demanding *Schlup* standard, I find that the prior order was not manifestly unjust.  Thus, I deny the reconsideration motion, and my ruling on respondents' dismissal motion stands.[110]

## C.    The motions for leave to file a third amended petition and to conduct discovery are denied.  [ECF Nos. 80, 81]

Melendez also moves to file a third amended petition and to conduct discovery based on his innocence argument.[111]  He acknowledges that the discovery motion will be moot if the court denies both the reconsideration motion and the motion for leave to file a third amended petition.[112]  Thus, I will first address his request to amend his petition.

Federal courts evaluate a motion to amend a habeas petition under Rule 15 of the Federal Rules of Civil Procedure.[113]  Though Rule 15(a)(2) requires that leave to amend be freely given "when justice so requires," it "is not to be granted automatically," and the court "considers the following five factors to assess whether to grant leave to amend: (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment; and (5) whether plaintiff has

---

[108] *Id.* at 11–14.

[109] ECF No. 21-1 at 53–62; ECF No. 78-13 at 7.

[110] ECF No. 70.

[111] ECF Nos. 80–81.

[112] ECF No. 79 at 11.

[113] *James v. Pliler*, 269 F.3d 1124, 1126 (9th Cir. 2001).

previously amended his complaint."[114]  Whether a proposed claim is exhausted, untimely, or

otherwise fails as a matter of law are relevant considerations in determining whether amendment

would be futile.[115]

Melendez's proposed third amended petition effectively seeks to abandon one of his

current claims[116] and add two new ones:

> Ground One: Margarita provided material, false testimony against Manuel, in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution….
>
> Ground Two: Trial counsel provided ineffective assistance, in violation of Manuel's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.
>
> >  A.  Trial counsel should've presented evidence from the eviction proceedings and the protection proceedings.
> >  B.  Trial counsel should've shown Margarita falsely accused others and failed to protect her own daughter from abuse.
> >  C.  Trial counsel should've shown Margarita may have had ulterior motives for lying.
> >  D.  Trial counsel should've presented evidence of Margarita's character for lying.
> >  E.  Trial counsel made an ineffective attempt to exclude A.C.'s out-of-court statements.[117]

Melendez concedes that Grounds One, Two (B), (C), and (D) are unexhausted, but asserts that

Grounds Two (A) and (E) or similar claims were litigated in the state post-conviction

proceedings.[118]

Respondents oppose both motions.[119]  They argue that the proposed third amended

petition would result in undue prejudice because Melendez has already received multiple

opportunities to amend his petition and an amendment at this late stage will unduly delay the

---

[114] *In re W. States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 738 (9th Cir. 2013) (internal punctuation omitted).

[115] *Caswell v. Calderon*, 363 F.3d 832, 837–39 (9th Cir. 2004).

[116] Ground 3 of the second amended petition, which alleges that Melendez was denied his right to a fair trial because the jury relied on an improper jury instruction regarding sexual assault, is not included in the proposed third amended petition.

[117] ECF No. 80-1.

[118] *Id.* at 20, 43.

[119] ECF Nos. 84–85.

proceedings.  They further assert that amendment is futile because the proposed new claims are untimely and mostly unexhausted, and do not relate back.  To the extent that Melendez intends to rely on allegations of actual innocence to overcome the procedural bars, respondents contend that Nevada law offers the same exception to overcome state procedural bars.

Melendez replies that he can overcome any procedural default or timeliness issue based on his innocence.[120]  He contends that the proposed new claims are technically exhausted because he already tried to litigate his innocence in state court unsuccessfully; thus, it is unlikely that Nevada courts would credit his innocence argument now.  Even if the claims are unexhausted, he could potentially seek a stay and abeyance.  Addressing the timing of the proposed third amended petition, Melendez argues that he should have the opportunity to litigate and prove his innocence-related claims and arguments.

As I have now fully considered Melendez's innocence argument and found that the gateway innocence claim is not viable, I find that amendment would be futile.  Melendez does not argue that the proposed third amended petition is timely or relates back to the original petition.  The proposed new claims are each tied to the innocence allegations and the only basis he relies on to overcome the time bar is the innocence argument, so the outcome of that argument constrains the result here.  The claims Melendez presents in his proposed third amended petition were readily apparent and available when both the original petition and the second amended petition were filed.  Even if I credit Melendez's argument that he should not be held responsible for the mistakes of his prior federal habeas counsel, he cannot overcome the futility of amendment because I have reviewed his innocence claim and found that it is not viable.  The motion to amend is thus denied and the discovery motion is denied as moot.

---

[120] ECF No. 87.

1

**Conclusion**

2      IT IS THEREFORE ORDERED that Melendez's Motion to Reconsider Order Denying

3 Leave to File a Supplemental Opposition to State's Motion to Dismiss **[ECF No. 79]** and Motion

4 for Leave to File Third Amended Petition **[ECF No. 80] are DENIED**.

5      IT IS FURTHER ORDERED that Melendez's Motion for Leave to Conduct Discovery

6 **[ECF No. 81] is DENIED as moot**.  A merits order will be issued in due course.

7

8                              _____
                              U.S. District Judge Jennifer A. Dorsey

9                              Dated:  3-4-2021

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28