# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| Manuel Melendez,<br><br>Petitioner<br><br>v.<br><br>Dwight Neven,[1] et al.,<br><br>Respondents | Case No. 2:15-cv-02076-JAD-VCF<br><br>**Order Denying Petition for Habeas Relief and Closing Case** |

Petitioner Manuel Melendez was convicted of five counts of lewdness with a child under the age of 14 and sentenced to five concurrent terms of life imprisonment with eligibility for parole after 10 years.[2] In the two remaining grounds of his petition, Melendez seeks a writ of habeas corpus under 28 U.S.C. § 2254, alleging that the jury relied on an improper jury instruction and his counsel was ineffective regarding the victim's out-of-court statements.[3] Having evaluated the merits of those claims, I find that habeas relief is not warranted, so I deny Melendez's petition, deny him a certificate of appealability, and close this case.

## Background

**A.     The facts underlying Melendez's convictions[4]**

A.C. testified that her step-grandfather, Melendez, whom she referred to as "Tata," touched her "pee-pee" once with his hand while she was clothed. A.C. thought the touching happened in the bathroom while Melendez was cleaning her. A.C. was three years old when the touching took place and seven years old at the time of the trial.

---

[1] Melendez initiated this habeas proceeding while he was incarcerated, but he was released on parole in 2020.

[2] ECF No. 19-11 at 4.

[3] ECF No. 51 at 24, 27.

[4] These facts are taken from the trial transcripts. ECF Nos. 17-5, 18-1, 19-1, 19-2. For simplicity's sake, I cite to these exhibits generally for this entire fact section. I make no credibility findings or other factual findings regarding the truth or falsity of this summary of the evidence from the state court. This summary is merely a backdrop to my consideration of the issues.

Margarita Melendez, who was Melendez's wife during the incidents in question, testified that she was the caregiver for her grandson, E.C., and her granddaughter, A.C. Margarita described three occasions where she returned home from the store early in the morning and found A.C. naked in her bedroom with Melendez. The first occasion took place in October or November 2006, and Margarita saw Melendez hugging A.C. The second occasion took place a week later, and Melendez was wearing only his underwear. On the third occasion, Margarita found A.C. sitting naked and wet on the bed, and Melendez informed her that he had bathed A.C. "because she went pee-pee."

Sometime later, in November or December 2006, Margarita entered the living room and found A.C. naked "kneeling on a pillow." Melendez was located behind A.C. and was touching her buttocks. When Melendez saw Margarita, "he jumped over the couch behind him pretending he was asleep." Margarita asked A.C. what happened, and A.C. said her "Tata takes [her] underwear off, and he touches [her] pee-pee." A.C. rubbed her vagina in demonstration.

On another occasion, while Margarita was driving home with A.C. in the backseat, A.C. told Margarita that her "Tata touches [her] pee-pee." When they arrived home, Margarita asked A.C. to repeat what she had said in the car, and A.C. "said that, [her] Tata touches [her] pee-pee [vagina] and my caca [anus] very hard, very hard."

Adriana Herrejon, Margarita's daughter and A.C.'s aunt, testified that Margarita, A.C., and E.C. moved in with her in early December 2006 because Margarita "had suspicions that . . . Melendez was molesting" A.C. Around this time, Herrejon asked A.C. "if Tata had touched her." A.C. said that he had but that it had not hurt. Herrejon asked A.C. what happened, and A.C. "said, he touched [her] in [her] pee-pee" and moved "her right hand palm up" back and forth in demonstration. Later, before A.C.'s interview with detectives on January 20, 2007, Herrejon told A.C. that "she needed to tell the detective everything," and A.C. told Herrejon "that Tata had put his guevo [penis] on her pompis [butt]." Herrejon asked A.C. if it hurt, and A.C. "said, no, it exploded."

Detective Sam Solorio with the Las Vegas Metropolitan Police Department testified that he conducted an interview with A.C. on January 20, 2007. In that interview, A.C. told Detective

Solorio "that her Tata, who was earlier identified as her step-grandfather, had touched her pompis [buttocks] and spread her cheeks." A.C. demonstrated this by standing up, turning around, bending over, grabbing her buttocks, and spreading her cheeks.

Danielle Zuber, a clinical social worker, testified that she conducted eleven counseling sessions with A.C. beginning in May 2007. On May 22, 2007, A.C. told Zuber that "her Tata touched her buttocks, or her butt" and pointed to her butt. On May 29, 2007, A.C. told Zuber "she [had] seen her Tata that day and that he touched her on her butt." On June 13, 2007, A.C. told Zuber "Tata touched her on her butt." Zuber "asked if it was a good touch or bad touch," and A.C. responded that "it was a good touch." And on October 24, 2007, "when [Zuber] asked [A.C.] again [if] the touch that her Tata did [was] a good touch or a bad touch, she replied, it was a good touch."

Melendez testified that he separated from Margarita at the end of August 2006 and had no contact with her until November. Melendez went to live with his cousin, Alejandro Rodriguez, until January 2007. Rodriguez testified and confirmed this timeline. Alma Hinojos, Melendez's sister-in-law, testified that she saw Melendez at Rodriguez's house "[a]bout three times a week" while he was living with Rodriguez. Melendez and Rodriguez traveled to Los Angeles, California in November 2006 for work. Luis Sandoval Alba testified that he did not know Melendez prior to November 2006, but he witnessed Melendez working on his daughter's house in Los Angeles from around November 20, 2006, to around December 20, 2006.

Melendez used the money he made from the work in Los Angeles to buy a car at the beginning of December. Melendez presented the dated bill of sale at his trial. Melendez sent Margarita $300 so that she could travel to Los Angeles. Margarita, A.C., and E.C. traveled to Los Angeles to visit Melendez and her sister, who lived in Los Angeles. Margarita returned home a few days later, and Melendez returned to Rodriguez's home in Las Vegas the following weekend.

While in Las Vegas, on December 28 or 29, 2006, Melendez and Margarita spent time together. During this encounter, Melendez and Margarita ran into Melendez's niece and nephew, who both testified that they saw Melendez and Margarita together holding hands. On January 18

or 19, 2007, a few days before Margarita contacted law enforcement to report A.C.'s abuse, Melendez met Margarita because he "wanted to talk to her about getting the divorce papers moving" and to request his wedding ring back. Melendez testified that he made the decision to end the marriage because he and Margarita were not "living together anymore, and every time [he] tried to get the marriage together again[,] it didn't work." He said that Margarita told him, "I'm not going to give you the ring back, I'm not going to give you nothing [sic] back. The only thing I'm going to do right now is throw a charge on you that you are abusing my little girl." Margarita told Melendez that "she's a small woman and knows how to talk to cops, and they always believe her, and she gets away with anything." Melendez denied ever touching A.C. inappropriately, implying that Margarita fabricated the allegations as revenge.

**B.     Procedural history**

In June 2010, a jury convicted Melendez of six counts of lewdness with a minor under the age of 14.[5] Melendez was sentenced on counts 1 and 2 to two consecutive terms of life imprisonment with eligibility for parole after 10 years.[6] Melendez was also sentenced to life imprisonment with eligibility for parole after 10 years for counts 3, 4, 5, 6, but those sentences ran current with each other and current with his sentences on counts 1 and 2.[7]

Melendez appealed, and the Nevada Supreme Court affirmed, in part, and reversed, in part, finding that there was insufficient evidence to support his conviction on count 2.[8] Following the Nevada Supreme Court's order, an amended judgment of conviction was entered in April 2012, revising his sentence to life imprisonment with eligibility for parole after 10 years on each of the five remaining counts, all of which were ordered to run concurrently.[9] Thereafter,

---

[5] ECF No. 19-3.

[6] ECF No. 19-6.

[7] *Id.*

[8] ECF No. 19-10.

[9] ECF No. 19-11.

Melendez filed a state habeas petition, which was denied by the state district court[10] and affirmed on appeal by the Nevada Court of Appeals.[11]

Melendez filed a *pro se* federal habeas petition, a counseled first amended petition, and a counseled second amended petition.[12] The respondents moved to dismiss Melendez's second amended petition, and I granted the motion, in part, dismissing grounds 1, 2, and 4(b).[13] The respondents answered the remaining grounds—grounds 3 and 4(a)—and Melendez replied.[14]

## Discussion

**A.    Legal standards**

### 1.    *Review under the Antiterrorism and Effective Death Penalty Act*

Federal habeas relief is governed by the Antiterrorism and Effective Death Penalty Act, also known as "AEDPA." If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of

---

[10] The state district court conducted a post-conviction evidentiary hearing. *See* ECF No. 21-1. Ana Margarita Herrejon, A.C.'s mother, testified that she did not believe Melendez molested A.C. *Id.* at 27. A.C. told Ana that she did not remember being molested by Melendez and that her "grandma told [her she] had been, so [she] said it happened" to avoid "get[ting] a whooping." *Id.* at 32. Ana also testified that Margarita physically abused Ana's son, E.C., made unfounded allegations of sexual abuse against Ana's father, and allowed Ana's brother to sexually abuse Ana's sister. *Id.* at 37, 39, 41. A.C. testified that Melendez never touched her inappropriately or in her private area. *Id.* at 54, 56. Abel Mendoza, A.C.'s step-father, testified that A.C. told him that she "only said what [she] was told to say by [her] grandma" regarding Melendez. *Id.* at 66. Rebecca Melendez, Melendez's daughter, testified that her son, A.M., resided with Melendez and Margarita briefly and that Margarita beat A.M., locked him in closets, and shoved his head into boards. *Id.* at 75–76. A.M. testified that when he was six or eight years old, Margarita treated him like a slave and punished him by throwing him into the wall, hitting him, pushing his head under the bed, locking him in a closet, refusing to feed him, refusing to let him use the restroom, and threatening to kill him. *Id.* at 83.

[11] ECF Nos. 20-1, 22-1, 22-4.

[12] ECF Nos. 1, 45, 51.

[13] ECF Nos. 57, 70.

[14] ECF Nos. 76, 77.

the evidence presented in the State court proceeding."[15] A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[16] And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[17] Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[18] The "objectively unreasonable" standard is difficult to satisfy;[19] "even 'clear error' will not suffice."[20]

Under AEDPA, the bar is high,[21] and federal habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[22] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[23] "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[24] AEDPA "thus imposes a

---

[15] 28 U.S.C. § 2254(d).

[16] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[17] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[18] *Id.* at 1705–06 (emphasis in original).

[19] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[20] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[21] As the United States Supreme Court acknowledged in *Harrington v. Richter,* 562 U.S. 86, 102 (2011), "[i]f this standard is difficult to meet, that is because it was meant to be."

[22] *Harrington*, 562 U.S. at 102.

[23] *Id.* at 103.

[24] *Id.* at 101.

'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[25]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[26] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[27] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[28]

### 2. *Standard for federal habeas review of an ineffective-assistance claim*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[29] Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[30] In *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[31] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[32]

"A reasonable probability is a probability sufficient to undermine confidence in the outcome."[33] Any review of the attorney's performance must be "highly deferential" and must

---

[25] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[26] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[27] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[28] 28 U.S.C. § 2254(e)(1).

[29] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[30] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 335–36 (1980)).

[31] *Strickland*, 466 U.S. at 690.

[32] *Id.* at 694.

[33] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

7

adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[34] "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or most common custom."[35] The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[36]

**B.     Evaluating Melendez's claims**

   **1.     *Ground 3—sexual assault jury instruction***

In ground 3, Melendez alleges that his right to a fair trial was violated because the jury was improperly instructed on sexual assault, a crime he was not charged with, and, based on the prosecutor's comments that he sexually assaulted A.C. in count 6, it is impossible to determine whether the jury convicted him under an improper sexual assault theory of liability.[37]

      ***a.     History of this ground***

Melendez's counsel objected to Jury Instruction No. 11.[38] Jury Instruction No. 11 provided that "[a] person who subjects another person to sexual penetration, against the victim's will or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his conduct, is guilty of sexual assault."[39] It also explained that "'[s]exual penetration' [means] any intrusion, however slight, of the genital or anal opening, including sexual intercourse in its ordinary meaning."[40] Melendez's counsel argued that this instruction "introduce[d] concepts that [were] not] really relevant to the charge, relevant to the Information, [were not] relevant to the fact[s]

---

[34] *Strickland*, 466 U.S. at 689.

[35] *Harrington*, 562 U.S. at 104.

[36] *Id.*

[37] ECF No. 51 at 24–26.

[38] ECF No. 19-1 at 6.

[39] ECF No. 52-6 at 13.

[40] *Id.*

we have heard before the Court."[41]  Melendez's counsel further argued that "it was confusing to the jury that it introduced a crime, introduced another fact which was not presented as evidence to the jury, was not even contemplated of the charging document by the State."[42]  The state district court disagreed:

> We did discuss all of that as we were settling instructions, and I don't disagree with you. The problem arises in the statutory definition of lewdness.  Lewdness is sexual conduct, not constituting sexual assault.
>
> It's hard to define lewdness without explaining sexual penetration being sexual assault, because by excluding that is how the act of lewdness is defined.
>
> And I don't disagree with you, it's just in the Court's opinion it's more confusing not to explain what sexual assault means regarding penetration because you need to understand what it's not, so you can understand the definition of lewdness.
>
> Lewdness is sexual conduct not amounting to sexual assault because there is no penetration.
>
> If that is not explained, I think that it raises more confusion than it creates.
>
> So I think it's necessary to give a definition of what sexual assault means in terms of penetration, and then explain that lewdness, which is what the Defendant's been charged with, is in fact specific types of conduct that does not constitute sexual assault. That is how the statute defines it, and I don't know how else you are going to explain it if you don't just say it like that.[43]

During the State's closing argument, the prosecutor stated: "[i]n this case the State has not charged any sexual assault.  We're not arguing sexual assault, but I used that definition in order to help you understand what is a lewdness [sic]."[44]  The prosecutor also commented that "[i]n regard to Count 6, . . . [Herrejon] told you that . . . she tells [A.C.], now tell the detective everything that happened with Tata, and that [A.C.] says to her, Tata put his guevo *in* my butt,

---

[41] ECF No. 19-1 at 6.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 30.

9

and it exploded."[45] This comment differed from Herrejon's actual testimony that A.C. told her "that Tata had put his guevo [penis] *on* her pompis [butt]."[46]

In affirming in part and denying in part Melendez's appeal of his judgment of conviction, the Nevada Supreme Court held that this instruction was not erroneous and that his convictions were not based on a legally invalid theory of sexual assault:

> Melendez argues that the district court erred by instructing the jury on the definition of sexual assault, which allowed the jury to convict him for lewdness based on the uncharged and legally invalid offense of sexual assault. We disagree. The district court instructed the jury that Melendez was charged with lewdness, which involves committing a lewd or lascivious act other than an act constituting the crime of sexual assault. *See* NRS 201.230. The district court instructed the jury on the definition of sexual assault to help the jury understand and distinguish acts of lewdness from acts of sexual assault. We conclude that this instruction was not erroneous and his convictions were not based on the legally invalid theory of sexual assault. *See Summers v. State*, 122 Nev. 1326, 1333, 148 P.3d 778, 783 (2006) ("[T]his court generally presumes that juries follow district court orders and instructions.").[47]

### b.   Analysis

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process.[48] The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'"[49] And significantly,

---

[45] *Id.* at 31–32 (emphasis added).

[46] ECF No. 18-1 at 26 (emphasis added).

[47] ECF No. 19-10 at 7.

[48] *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error.").

[49] *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

when reviewing a jury instruction, the court must consider the jury instruction in issue "in the context of the instructions as a whole and the trial record."[50]

Nev. Rev. Stat. § 201.230(1)(a) provides that "[a] person is guilty of lewdness with a child if he or she . . . willfully and lewdly commits any lewd or lascivious act, other than acts constituting the crime of sexual assault." This definition mirrors Jury Instruction No. 12.[51] And as the Nevada Supreme Court reasonably determined, to understand the definition of lewdness and Jury Instruction No. 12, it was necessary to also instruct the jury on the definition of sexual assault. Reviewing the sexual assault instruction in the context of the instructions as a whole, the Nevada Supreme Court reasonably concluded that the sexual assault instruction was not erroneously given. Melendez thus fails to demonstrate that the sexual assault instruction "infected the entire trial [such] that [his] resulting conviction violate[d] due process."[52]

Nor has Melendez shown that the jury convicted him under an improper sexual-assault theory of liability based on the prosecutor's erroneous closing argument comment. It appears

---

[50] *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.").

[51] Jury Instruction No. 12 provided:

> Any person who willfully commits any lewd or lascivious act, other than acts constituting the crime of Sexual Assault, upon or with any part of the body of a child under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust or passions or sexual desires of that person or of that child, is guilty of Lewdness With a Minor.
>
> The law does not require that the lust, passions[,] or sexual desires of either or such persons actually be aroused, appealed to, or gratified.
>
> To constitute a lewd or lascivious act it is not necessary that the bare skin be touched. The touching may be through the clothing of the child.
>
> Consent of the minor is not a defense to this charge.

ECF No. 52-6 at 14.

[52] *Cupp*, 414 U.S. at 147.

11

that the prosecutor used the wrong preposition—"in" instead of "on"—in discussing count 6.[53] However, to show constitutional error based on an invalid theory of liability claim, Melendez must demonstrate that the "jury [was] instructed on alternative theories of guilt and return[ed] a general verdict that may [have] rest[ed] on a legally invalid theory."[54]  Because the verdict form only gave the jury the option of finding Melendez guilty of lewdness—not sexual assault[55]—and because the prosecutor made it clear that it was not charging sexual assault,[56] the Nevada Supreme Court reasonably determined that Melendez's convictions were not based on an invalid theory of liability.  Melendez is not entitled to federal habeas relief for ground 3.

### 2. Ground 4(a)—A.C.'s out-of-court statements

In ground 4(a), Melendez alleges that his constitutional right to effective assistance of counsel was violated because his counsel inadequately challenged the introduction of A.C.'s out-of-court accusations.[57]

#### a. State law

According to Nev. Rev. Stat. § 51.385(1), "a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child . . . is admissible in a criminal proceeding regarding that act of sexual conduct . . . if" the state district court "finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness" and "[t]he child testifies at the proceeding or is unavailable or unable to testify."  To "determine[e] the

---

[53] *Compare* ECF No. 19-1 at 31–32 (the prosecutor's comment that A.C. told Herrejon that "Tata put his guevo *in* [her] butt"), *with* ECF No. 18-1 at 26 (Herrejon's trial testimony that A.C. told her that "Tata had put his guevo [penis] *on* her pompis [butt]").

[54] *Skilling v. United States*, 561 U.S. 358, 414 (2010); *see also Yates v. United States*, 354 U.S. 298, 312 (1957) ("[A] verdict [must] be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978); *Stromberg v. California*, 283 U.S. 359, 368 (1931) ("[I]f any of the clauses in question is invalid under the Federal Constitution, the conviction cannot be upheld.").

[55] *See* ECF No. 19-3.

[56] *See* ECF No. 19-1 at 30.

[57] ECF No. 51 at 27.

12

trustworthiness of a statement," the state district court considers "whether: (a) [t]he statement was spontaneous; (b) [t]he child was subjected to repetitive questioning; (c) [t]he child had a motive to fabricate; (d) [t]he child used terminology unexpected of a child of similar age; and (e) [t]he child was in a stable mental state."[58]

### b. History of this ground

The state district court held a hearing under Nev. Rev. Stat. § 51.385 outside the presence of the jury.[59] Herrejon, Margarita, Detective Solorio, and Zuber testified at that hearing about the statements A.C. made to each of them.[60] Herrejon testified that she asked A.C. if Melendez touched her, and A.C. responded in the affirmative.[61] Herrejon asked A.C. if Melendez hurt her, and A.C. responded again in the affirmative.[62] And when Herrejon asked A.C. how Melendez touched her, A.C. moved her hand back and forth.[63] On a separate occasion, A.C. told Herrejon that Melendez "put his guevo [penis] . . . on her butt."[64] When Herrejon asked A.C. if that hurt, A.C. responded, "no, he put it in my butt, and it exploded."[65]

Margarita testified that she asked A.C. what happened after she found A.C. naked with Melendez, and A.C. told her "Tata takes [her] clothes off, and he touches [her], he rubs [her] vagina, and that hurts a lot."[66] A.C. also told Margarita that Melendez "would put pee-pee on her butt."[67] On another occasion, while they were driving, A.C. told Margarita "her Tata would

---

[58] Nev. Rev. Stat. § 51.385(2).

[59] ECF No. 18-1 at 5.

[60] *Id.* at 6, 15, 40, 45.

[61] *Id.* at 6–7.

[62] *Id.* at 7.

[63] *Id.*

[64] *Id.* at 8.

[65] *Id.*

[66] *Id.* at 16.

[67] *Id.*

13

hurt her a lot in her vagina, . . . that he would put pee-pee in - - on her butt."[68]  Margarita asked A.C. to again explain what happened once they arrived home, and A.C. said "her Tata would touch her private parts, her butt, her vagina, and she said that he would rub her, and it would hurt her a lot."[69]

Detective Solorio testified that A.C. "made a disclosure" during her forensic interview that "her step-grandfather had touched her pompis, which is her buttocks," and "spread her cheeks."[70]  And Zuber, A.C.'s counselor, testified that A.C. "told [her] that her Tata had touched her here and pointed to her buttocks," A.C. later "repeated that Tata touched her on her butt," and A.C. "again repeated that Tata touched her on her butt," indicating that it was a good touch.[71]

Melendez's counsel opposed the admission of these testimonies at trial.  Regarding Herrejon, counsel explained that he "had no idea she was going to say any of these things . . . because . . . the detective lost both the audio [of her interview]. . . and [he] didn't file [a] motion."[72]  Counsel also argued that "having subsequent witnesses come and testify about the same conduct [that A.C. would be testifying about] would be cumulative and . . . damaging as it bolsters [A.C.'s] testimony," A.C. did not volunteer the information to Herrejon spontaneously, and A.C. made the statements in a coercive environment.[73]  Counsel argued that Margarita's testimony would be cumulative.[74]  Counsel argued that Detective Solorio's testimony about A.C.'s statement and demonstration were inconsistent with other witness testimony.[75]  And

---

[68] *Id.* at 17.

[69] *Id.*

[70] *Id.* at 40–41.

[71] *Id.* at 45–46.

[72] *Id.* at 11.

[73] *Id.* at 13–14.

[74] *Id.* at 20.

[75] *Id.* at 50.

14

counsel argued that Zuber's testimony about A.C.'s statements was irrelevant because some of them lacked "mention of sexual conduct."[76] The state district court ruled that Herrejon, Margarita, Detective Solorio, and Zuber would be allowed to testify.[77]

In affirming the denial of Melendez's state habeas petition, the Nevada Court of Appeals held that Melendez failed to show that his trial counsel's performance was deficient or resulted in prejudice:

> Melendez argues his trial counsel was ineffective for failing to properly challenge admittance of the child victim's out-of-court statements pursuant to NRS 51.385. Melendez argues the statements were not trustworthy because there were inconsistencies between the various statements and because the victim's grandmother was not credible. Melendez also argues counsel should have sought further testimony from the child victim after the adult witnesses testified regarding her statements. Melendez fails to demonstrate his trial counsel's performance was deficient or resulting prejudice.
>
> Preliminarily, we note Melendez did not question his trial counsel at the evidentiary hearing regarding counsel's decisions relating to the admission of the victim's out-of-court statements. Rather, the trial counsel's testimony related to cross-examination of the victim generally. As Melendez failed to pursue this claim at the evidentiary hearing, he did not meet his burden to demonstrate that counsel was deficient with respect to admission of the child's statements. *See Means*, 120 Nev. at 1012, 103 P.3d at 33 (explaining a petitioner has the burden to establish the factual allegations underlying a claim of ineffective assistance of counsel); *see also Strickland*, 466 U.S. at 690 (recognizing "counsel is strongly presumed to have rendered adequate assistance").
>
> Moreover, at the evidentiary hearing, trial counsel testified his pretrial investigation revealed information that caused him to conclude there was a likelihood that one or more of the victim's allegations were truthful. In addition, the victim was only three years old when the incidents occurred and only seven at the time of trial. For those reasons, counsel testified that he had to proceed cautiously regarding the victim's version of events. Tactical decisions such as this one "are virtually unchallengeable absent extraordinary circumstances," *Ford v. State*, 105 Nev. 850, 853, 784 P.2d 951, 953 (1989), which Melendez does not demonstrate.
>
> Further, the child victim had made multiple statements to multiple persons regarding the abuse, not merely to her grandmother. Those persons included a police detective and a social worker.

---

[76] *Id.* at 51.

[77] *Id.* at 14–15, 21, 50–51.

> The district court concluded that counsel acted appropriately regarding the admission of the child's out-of-court statements and counsel appropriately challenged the inconsistencies in the victim's version of events. The district court further concluded Melendez failed to demonstrate a reasonable probability of a different outcome had counsel performed different actions with respect to admission of the child's out-of-court statements. Substantial evidence supports that conclusion. Therefore, the district court did not err in denying this claim.[78]

        *c.*      *Analysis*

Melendez argues that I should review this ground *de novo* because the Nevada Court of Appeals' determination that he failed to pursue this claim at the evidentiary hearing was based an unreasonable determination of the facts.[79] I agree. At the post-conviction evidentiary hearing, the state district court agreed with Melendez's post-conviction counsel that it had previously indicated that the post-conviction evidentiary hearing was being held regarding "the issues of the new evidence"[80] and that it was "not concerned about the trial tactics."[81] Therefore, Melendez did not fail to pursue this claim at the evidentiary hearing as the Nevada Court of Appeals found; rather, he was prevented from doing so. Consequently, because the Nevada Court of Appeals' decision was based on an unreasonable determination of the facts, I review this ground *de novo*.[82]

But that review does not result in relief for Melendez. "An attorney's failure to prepare for and challenge the testimony of a critical witness may be so unreasonable as to violate both

---

[78] ECF No. 22-4 at 2–3.

[79] ECF No. 92 at 39.

[80] This new evidence, although not relevant to the remaining grounds in Melendez's petition, is outlined in part in footnote 10, *supra*.

[81] ECF No. 21-1 at 6–7.

[82] *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007) ("As a result of [the state court's] error, our review of petitioner's underlying . . . claim is unencumbered by the deference AEDPA normally requires"); *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014) ("If we determine, considering only the evidence before the state court, that . . . the state court's decision was based on an unreasonable determination of the facts, we evaluate the claim de novo.").

16

prongs of the *Strickland* test."[83]  Melendez's counsel opposed the testimony of Herrejon, Margarita, Detective Solorio, and Zuber as it related to A.C.'s out-of-court statements. Melendez argues that his counsel's opposition was inadequate because he should have made the following arguments about the untrustworthiness of A.C.'s out-of-court statements: (1) A.C.'s statements to Detective Solorio were made in response to repetitive questioning and in a non-spontaneous environment; (2) A.C.'s statements to Zuber were not inculpatory because she said Melendez's touches were good touches; (3) A.C.'s statements to Herrejon were not spontaneous and were inconsistent, (4) Margarita's testimony about A.C.'s statements was inconsistent with Margarita's statements to police and during the preliminary hearing; (5) there was no physical evidence corroborating A.C.'s statements; and (6) A.C.'s out-of-court statements were inherently unreliable given her age at the time they were made.[84]

These arguments would have been beneficial in opposing the admissibility of the testimony of Herrejon, Margarita, Detective Solorio, and Zuber as they related to A.C.'s out-of-court statements.  Indeed, opposing these statements was likely one of counsel's more important roles given that A.C.'s trial testimony alone was insufficient to support a lewdness conviction. However, given that Melendez's counsel opposed the testimony, questioned the witnesses at the hearing, and argued against admission of the testimony, it is not readily apparent that counsel's performance was unreasonable.[85]

Even assuming, *arguendo*, that counsel's opposition to the testimony was deficient, Melendez fails to demonstrate prejudice.[86]  Melendez contends that had his counsel made a fulsome inadmissibility argument, the state district court would have excluded Herrejon,

---

[83] *Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002); *see also Delgadillo v. Woodford*, 527 F.3d 919, 928 (9th Cir. 2008) ("A trial counsel's failure to object to evidence which is inadmissible under state law can constitute deficient performance under *Strickland*.").

[84] ECF No. 92 at 31–35.

[85] *See, e.g., United States v. Litteral*, 910 F.2d 547, 554 (9th Cir. 1990) (finding that counsel was not ineffective in representing the defendant where, although facts might have been more effectively developed in support of the defendant's motion to suppress, counsel more than adequately presented defendant's motion).

[86] *Strickland*, 466 U.S. at 690.

Margarita, Detective Solorio, and Zuber's testimonies concerning A.C.'s out-of-court statements,[87] but this contention is without basis in the record. The state district court cited the applicable statute at the beginning of the hearing, outlined the trustworthiness factors it must consider, heard the witnesses' testimonies, and went through the trustworthiness factors on the record for each witness before ruling the testimonies admissible.[88] Regarding the trustworthiness of A.C.'s statements to Margarita, the state district court even indicated that it did not "have any hesitation" in admitting the testimony.[89] Because the state district court thoroughly evaluated the testimony under the factors outlined by the applicable statute and appeared resolute in its decision that the testimonies were admissible, there is no reasonable probability that the result of the proceedings would have been different had counsel given a more complete argument in support of disallowing the evidence.[90]

Because Melendez has failed to demonstrate prejudice to support his ineffective-assistance-of-trial-counsel claim, he is not entitled to federal habeas relief for ground 4(a).[91]

## C.   Certificate of Appealability

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability. To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[92] "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional

---

[87] ECF No. 92 at 36.

[88] ECF No. 18-1 at 5, 15, 21, 50–51.

[89] *Id.* at 21.

[90] *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

[91] Melendez requests an evidentiary hearing. ECF No. 51 at 32. But he fails to explain what evidence would be presented at an evidentiary hearing. Moreover, I have already determined that he is not entitled to relief, and that decision would not change with further factual development or any evidence that may be proffered at an evidentiary hearing. Melendez's request for an evidentiary hearing is therefore denied.

[92] 28 U.S.C. § 2253(c).

claims debatable or wrong."[93]  Because I have rejected Melendez's constitutional claims on their merits, and he has not shown that this assessment of these claims is debatable or wrong, I find that a certificate of appealability is unwarranted for this case and I decline to issue one.

### Conclusion

IT IS THEREFORE ORDERED that the petition **[ECF No. 51] is DENIED**, and because reasonably jurists would not find my decision to deny this petition to be debatable or wrong, a **certificate of appealability is DENIED**.

The Clerk of Court is directed to ENTER JUDGMENT for respondents and CLOSE THIS CASE.

Dated: December 1, 2021

_____
U.S. District Judge Jennifer A. Dorsey

---

[93] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).